# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

|                          |     |                          |
|--------------------------|-----|--------------------------|
| IN RE                    | )   |                          |
|                          | )   | **Case No. 04-04261-TLM** |
| **JERRY L. KORN**        | )   |                          |
|                          | )   | **MEMORANDUM**           |
| Debtor.                  | )   | **OF DECISION**          |
| _____  | )   |                          |

The Court must decide whether to allow a § 503(b)(1)(A)[1] administrative

expense against this bankruptcy estate for nearly $600,000.00 allegedly incurred

by a commercial real estate development company relocating dozens of exotic

animals.  *See* Doc. No. 249.  The chapter 11 debtor in possession, the United

States Trustee ("UST") and several other parties object.  Following an extended

evidentiary hearing, the Court took the issue under advisement.  The following are

its factual findings and legal conclusions on this contested matter.  Fed. R. Bankr.

P. 7052, 9014.

## BACKGROUND AND FACTS

Jerry L. Korn ("Debtor") filed an individual chapter 11 petition on

November 30, 2004.  Prior to filing, Debtor was involved in lengthy and highly

contentious divorce litigation with his former spouse, Susan Korn ("Susan").

---

[1] References are made to the Bankruptcy Code, Title 11, U.S. Code, as it existed prior to
the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"),  Pub. L.
109-8, 119 Stat. 23 (April 20, 2005).

MEMORANDUM OF DECISION - 1

While a divorce had been granted, substantial issues concerning property division

remained.  Intractable disputes between Debtor and Susan led the state court to

appoint a custodian, Mark Clark ("Custodian") to, *inter alia,* liquidate certain real

property Susan and Debtor owned in Nampa, Idaho ("Nampa Property").

### A.    The Nampa Property

The Nampa Property consisted of 15 acres near the intersection of Garrity

Boulevard and Interstate 84 on the east side of Nampa.  Debtor's residence was

located on this property along with a large animal preserve he operated through a

closely held corporation, For the Birds, Inc. ("FTB").[2]  The animals included a

giraffe, several tigers, a cougar, bear, an elk herd, other mammals and reptiles, a

number of swans and other exotic birds.  FTB generated income by, among other

things, leasing the birds to resorts and other businesses.  Several of the animals

were allegedly not owned by FTB but, rather, were on loan to FTB and/or Debtor

---

[2] FTB filed a chapter 11 petition contemporaneously with that of Debtor.  *See* Case No. 04-4260-TLM.  The Court dismissed the case on FTB's motion on May 18, 2005.  Debtor continued to manage FTB post-dismissal.  FTB's schedules and statements disclosed it owned no real property, did business on the Nampa Property, and owned about $65,000.00 worth of exotic animals.  *Id.* at Doc. No. 11 (scheds. A, B, statement of financial affairs at response to question 16).  FTB is clearly owned, at least to some significant degree, by Debtor.  FTB's list of equity security holders says there were "none" which obviously cannot be accurate.  Its response to question 19(b) on its statement of financial affairs was incomplete in identifying stock ownership but appeared to indicate at least four persons, including Debtor, each held at least 5% or more of the outstanding voting stock.  A proposed disclosure statement in the instant case asserted Debtor was the "sole stock holder" of both Dairy Health, Inc. ("DHI") and FTB.  Case No. 04-4260-TLM, Doc. No. 183 at 3.

MEMORANDUM OF DECISION - 2

from various zoos around the country for breeding purposes.  *See* Custodian's
Judicial Notice Ex. 7 (Internal Exs. A-E).[3]

The Nampa Property bordered the site chosen for the Nampa Gateway
Center ("Gateway Project"), a $90,000,000.00 shopping complex covering over
100 acres that will ultimately include more than 800,000 square feet of "big box"
and "medium box" retail outlets, restaurants, and other shops.  The project was
and is being developed by DDR Nampa, LLC ("DDR"), a subsidiary of
Developers Diversified Realty, a national real estate firm.  The Nampa Property
was integral to the Gateway Project, and was adjacent to space set aside for one of
DDR's anchor tenants.

In the summer of 2005, DDR offered $1,700,000.00 for the land itself, and
agreed to make available another $50,000.00 to reimburse Debtor for costs to be
incurred removing the animals.  The purpose of the $50,000.00 was at least two-
fold according to Stan Hoffman, DDR's vice president of development.  Hoffman
testified he thought it would be enough to get the relocation process started.  More
importantly, it gave DDR a means to "influence the timing for the relocation."

Hoffman's desire to get the animals, Debtor's personal property, and
Debtor off the Nampa Property as soon as possible was intense and relentless.  It

---

[3] Debtor also operated DHI on the Nampa Property.  It too was a closely held
corporation controlled by Debtor which provides products and services to dairy farmers in the
region.

MEMORANDUM OF DECISION - 3

was even palpable at the hearing on DDR's present request. In his view, time was a luxury DDR could not afford. In addition to clearing the property, it still had to complete engineering, ground work, and other tasks so it could "deliver the site" to an anchor tenant no later than March 1, 2006.

Debtor told Hoffman he needed between 90 and 120 days to complete the relocation. Hoffman reluctantly agreed to this timeline. Accordingly, the parties set an initial animal removal deadline of September 24, 2005, with a final removal date of October 24, 2005.

### B.    Sale Agreement between Debtor and DDR

The Court ultimately approved an agreement between Debtor and DDR ("Sale Agreement"), Doc. No. 110 at Ex. B, under an Order, Doc. No. 110 ("Sale Order"). The Sale Agreement contained, in relevant part, the following terms:

> **Section 8.  Default; Remedies.**  . . . In the event that Seller [Debtor] is unable to deliver or comply with any item herein required of Seller at Closing or to otherwise be performed pursuant to the terms of this Agreement, Buyer [DDR] shall have the right and option to: (i) terminate this Agreement upon written notice to Seller and receive a full refund of the Earnest Money; or (ii) demand and compel by legal proceedings (including specific performance) compliance of the terms of this Agreement, including, without limitation, the immediate conveyance of the Property by the Korns. *Seller consents to the jurisdiction of the Bankruptcy Court to enforce the terms of this Agreement after Closing, including but not limited to, the Animal Removal . . . [and] any claims of the Buyer against the Korns and the Estate and the surrender of possession of the Property.*

> **Section 11.  Entire Agreement.** This Agreement constitutes the sole and entire agreement among the parties hereto and no modification of

MEMORANDUM OF DECISION - 4

this Agreement shall be binding unless in writing and signed by all parties hereto.

**Section 15.  <u>Applicable Law</u>.**  This Agreement shall be construed under the laws of the State of Idaho.

*Id*. at Ex. B (emphasis added).  Section 21 of the Sale Agreement dealt with the

animal removal process.  It stated in relevant part:

<u>**Removal of Animals**</u>.  Within two (2) business days after entry of the Sale Order, Buyer shall deposit in escrow . . . the sum of Fifty Thousand Dollars ($50,000.00) to be held in a trust account . . . (the "Animal Removal Deposit").  The Animal Removal Deposit shall be payable . . . to Jerry Korn solely for third party costs actually incurred by Jerry Korn in removing all of the animals currently located on the Property . . . (the "Animal Removal"), such Animal Removal not intended to serve as condition to Closing but rather as an obligation of Jerry Korn before and following Closing.  Within ninety (90) days of Buyer submitting the Animal Removal Deposit (the "Animal Removal Period"), Jerry Korn covenants and agrees to satisfactorily complete the Animal Removal, during which time Jerry Korn shall also be entitled to occupy the Property.  In the event Jerry Korn diligently pursues completion of the Animal Removal, but is unable to complete the Animal Removal prior to the expiration of the Animal Removal Period, the Animal Removal Period shall be automatically extended for an additional thirty (30) days, during which time Jerry Korn shall further be entitled to occupy the Property.

*Id*.  The "consequences" of Debtor's failure to meet the final deadline were also

addressed in § 21:

In the event Jerry Korn fails to diligently pursue the completion of the Animal Removal or fails to complete the Animal Removal prior to the expiration of the Animal Removal Period, as extended (which completion shall be determined in Buyer's reasonable discretion), Jerry Korn shall no longer have any right to occupy the Property, Jerry Korn agrees to immediately vacate the Property and remove all of his personal property which he desires to remove, *and the Animal Removal*

MEMORANDUM OF DECISION - 5

> *Deposit shall be immediately returned to Buyer.*  Notwithstanding anything contained herein to the contrary, upon the expiration of the Animal Removal Period, as extended, Jerry Korn shall no longer have any right to occupy the Property and agrees to immediately vacate the Property and remove all of his personal property which he desires to remove.

*Id.* (emphasis added).

The Sale Order provided the $50,000.00 in Animal Removal funds would be deposited into a trust account maintained by Michael T. Spink, DDR's local counsel ("Trust Account").[4]  Doc. No. 110 at 10, ¶ 9(a).  Disbursements would be made to cover "expenses actually incurred in removing the Animals" from the Nampa Property, provided Debtor submitted a written request with supporting documentation to Spink.  *Id.* at 10-11, ¶ 9(b).  The Sale Order also provided:

> The DDR Funds shall be disbursed from the Trust Account only upon entry of an order of this Court, allowing such disbursal.  Such order may be obtained either (a) through the filing of separate motions as to separate disbursements to be heard by the Court; or (b) through submission to the Court of a proposed order, approved by the Custodian, the Debtor, [Susan] and DDR, proposing a process for disbursal to which all such parties consent.

*Id.* at 11, ¶ 9(c).  The intent that a maximum of $50,000.00 would be made available was evidenced by a provision requiring any "excess proceeds" of the

---

[4]  The Sale Order, Doc. No. 110 at 6, ¶ W,  made a finding that the provisions regarding the $50,000.00 payment as addressed in § 21 of the Sale Agreement, including placing the trust account with Debtor's lawyer, would be altered by the terms of the Sale Order.

MEMORANDUM OF DECISION - 6

"DDR Funds" (*i.e.*, the $50,000.00) be deposited into the Court's registry. *Id.* at

¶ 9(d).[5]  Closing on the sale of the Nampa Property occurred July 15, 2005.[6]

### C.    Removing the animals

Following entry of the Sale Order, Debtor advised DDR the animals would

be moved to an as yet undeveloped site in Payette, Idaho ("Payette Property"), 60

to 70 miles northwest of the Nampa Property.  The Payette Property was and is

owned by Debtor's mother, Lois Korn.  Debtor claims no interest in the property,

though DDR believed Debtor "controlled" it.  *See* Doc. No. 249 at 3.

Hoffman immediately "tasked" a team to monitor Debtor's progress.

Within a matter of weeks he received reports that construction of new animal

habitats on the Payette Property and overall animal relocation efforts were

proceeding slowly.  In addition, upon auditing Debtor's expenditures, Hoffman

and his team suspected Debtor was spending part of the $50,000.00 on costs

unrelated to animal removal.  Despite this, DDR did not allege breach of the Sale

---

[5] The Sale Order was entered June 23, 2005.  By an "omnibus" order entered five days later, the Court found that due to the entry of the Sale Order and its provision of the DDR Funds to accomplish the transfer of the animals, the Custodian's motions – including a motion for post-petition credit under § 364 or for an administrative claim under § 503 to facilitate and accomplish such removal – were rendered moot.  Doc. No. 112 at 13-14.

[6] A dispute arose on closing because Debtor had failed to remove certain drums, which (unlike animal removal) was a condition of closing.  Doc. No. 110, Ex. B at ¶ 20(iii).  The closing occurred with DDR reserving the right to file an administrative expense claim for the costs of removal and any consequential damages.  DDR's oft-mentioned "environmental claims" are not part of the present dispute.

Agreement or Sale Order.  Nor did it seek Court enforcement of the provisions

contained therein.  Instead, DDR supported a modified Trust Account process.

### D.    The Funds Order

On August 9, 2005, Debtor filed a "Motion for Order Allowing Release of

Funds Held for Removal of Animals, and From Trust Funds Received in

Connection with the Sale of Real Property of the Estate."  Doc. No. 120.  Debtor

sought reimbursement from the Trust Account for $13,331.00 in animal relocation

costs.  He also moved the Court for an order determining Trust Account funds

could be used to reimburse the costs of constructing replacement habitats for the

animals, arguing that "implicit in the agreement and funding of the removal of the

animals, was the reimbursement to Debtor by DDR of the cost of construction of

new habitats for the animals."  *Id*. at 2, ¶ 2.  Debtor argued if the DDR Funds

could not be used for new habitats but only for "removal" (transport), the real

estate sales proceeds should be released to Debtor.  In addition, Debtor proposed a

procedure for streamlining future disbursements from the Trust Account that did

not require an order from the Court.  *Id.* at 3, ¶ 3.

On August 18, 2005, the Court entered an Order Releasing Funds, Doc. No.

135 ("Funds Order"), which:

      a.     authorized the immediate release of $13,131.00 from the Trust
              Account to reimburse expenses incurred by Debtor;
      b.     authorized DDR's local counsel, Michael Spink, to release "any and
              all other DDR funds held in trust by him for expenses actually

MEMORANDUM OF DECISION - 8

> incurred or to be incurred in association with the construction of
> alternate habitats, transportation associated with the removal of the
> animals from the Nampa Idaho property and their relocation to the
> Payette Idaho property,"
>
> c.    obviated the need for a court order to effect each Trust Account
>       disbursement; and
>
> d.    provided DDR and Susan access to the Payette Property and to "any
>       financial accounting records pertaining to the utilization of the DDR
>       funds."

*Id.* at 1-3.  Neither the Funds Order nor Sale Order specifically referenced any

expenditures beyond "any and all other DDR funds held in trust," which,

following the initial authorized disbursement, was $36,869.00 (*i.e.*, $50,000.00

less $13,131.00).  *See also* Ex. A (Spink letter dated Aug. 18, 2005).

### E.    DDR's involvement in the animal relocation process

By September, DDR had become directly involved in the habitat

construction effort.  Hoffman had assigned Steven Fausett, DDR's development

director for its "Western Region," to supervise the project.  Hoffman provided

little guidance, aside from imploring Fausett to clear the Nampa Property as

quickly as possible.

As Fausett soon realized, a Herculean effort lay ahead.  Development of the

zoo facility on the Payette Property required ground preparation (drainage,

substructure, etc.) and the building of pens, corrals and enclosures.  DDR

discovered Debtor was having difficulties finding adequate sources of construction

supplies and qualified workmen to complete this construction.  It also learned

MEMORANDUM OF DECISION - 9

governmental regulations imposed upon those owning, keeping and/or transporting exotic animals were detailed and multi-layered. The State of Idaho, as well as Canyon and Payette Counties, all had jurisdiction, not to mention numerous concerns and objections.

Fausett, with weekly "encouragement" from Hoffman, pressed on. He arranged for contractors from the Nampa Property to work in Payette. They were paid by DDR under the project account for the Gateway Project. At least one of these contractors supervised employees working on the Payette ground work and various pens, cages and other construction work.

Fausett also made arrangements to acquire materials. Sometimes he would purchase them directly from suppliers, while other times he would allow the contractors supervising the work to use his and Hoffman's Home Depot credit cards. No budgets were prepared or competitive bids put out. Because no one involved in the project had any experience relocating a private zoo, decisions were made, in Hoffman's words, "on the fly." Due to the urgency and focus of the task, Fausett admitted he was not thinking about the terms of the Sale Agreement, Sale Order or Funds Order when authorizing expenditures.

### F.    Sale Agreement deadlines pass

Soon, construction and "relocation" expenditures were being made on a weekly and even daily basis. By September 23, 2005, a little over $12,000.00

MEMORANDUM OF DECISION - 10

remained in the Trust Account. *See* Ex. F.1 (summary of Trust Account expenditures). In addition, DDR and its agents had authorized thousands of dollars in direct payments to vendors for materials. *See* Exs. F.2, F.2.A. On the September 24, 2005 deadline date, the animals remained on the Nampa Property. Pursuant to § 21 of the Sale Agreement, however, Debtor received a 30-day extension.

By mid-October, the original $50,000.00 deposited into the Trust Account was gone. *See* Ex. F.1 (Disbursement Nos. 1-8). DDR deposited an additional $12,000.00 into the account. Hoffman testified Debtor did not request these additional funds. The Court was not notified or asked to approve this change to the Sale Agreement and Sale Order, however Debtor's attorney, the Custodian, the UST and Susan's attorney were all notified of the deposit in a letter from Spink dated October 14, 2005. The $12,000.00 was "to be disbursed on the same terms as the initial $50,000." Ex. A(8).

In the ensuing months, as expenses continued to grow, DDR funneled additional monies into the Trust Account.[7] With each deposit, Spink notified the

---

[7] *See* Exs. A(12) ($10,000.00 on 11/11/05), A(14) ($20,000.00 on 12/8/05), A(17) ($15,000.00 on 12/16/05), A(20) ($20,000.00 on 1/6/06), A(25) ($74.64 on 2/13/06). These deposits were in addition to the $12,000.00 on October 14, 2005 noted in the text, and in addition to the initial $50,000.00. These deposits totaled $127,074.64. All the deposits are noted only in letters from Spink contained in the noted exhibits; the summaries regarding the Trust Account do not show the deposits, only disbursements. DDR also caused two checks for $15,000.00 each to be issued on March 3, 2006, from the Trust Account payable to FTB. Ex. A(27). There is no letter showing a corollary deposit to the Account of $30,000.00, but DDR seeks a total of

(continued...)

MEMORANDUM OF DECISION - 11

interested parties via letter.  No one objected and the Court was not notified of the additional deposits.

When the final animal removal deadline of October 24, 2005 arrived, the animals were still on the Nampa Property.  By that time, DDR and its agents had expended more than $57,000.00 through the Trust Account (the original $50,000.00 plus part of the additional $12,000.00 deposit)[8] and made more than $61,000.00 in direct payments.[9]

Despite expending more than the $50,000.00 provided in the Sale Agreement, and notwithstanding Debtor's failure to meet the October 24, 2005 deadline, DDR did not declare a default, did not pursue any of the remedies provided for under §§ 8 and 21 of the Sale Agreement, and did not otherwise try "to enforce the terms of [the] Agreement . . . including, but not limited to, the Animal Removal . . . [or] any claims against [Debtor]."  Doc. No. 110, Ex. B at § 8.  Hoffman conceded as much at hearing.  Due to the urgency of completing the Gateway Project on time, he claimed he had no choice but to keep the animal relocation process moving.

---

[7](...continued)
$157,074.64 and all the objectors use that figure.  The Court will assume for this Decision the $157,074.64 figure is accurate.

[8] See Ex. A(9) (Spink letter, dated October 21, 2005, stating DDR had deposited a total of $62,000.00 into the Trust Account and $4,882.22 remained).

[9] See Exs. F.2, F.2.A (check requests made prior to Oct. 24, 2005).

MEMORANDUM OF DECISION - 12

Though it was a drain on its attention and resources, DDR claimed the animal removal was a lynchpin to a more significant business and financial concern – the timely development of the Gateway Project.  Hoffman emphasized how critical it was to get Debtor and his animals off the Nampa Property and deliver a portion of the Gateway Project site by March 1, 2006 to an anchor tenant. He charged Fausett with getting it done by whatever means necessary, and reminded him constantly of it.[10]  Fausett obeyed, and made whatever arrangements and spent as much money he deemed necessary to achieve his assigned goal.

However, in late February 2006, DDR negotiated the anchor tenant's move to the other side of the development, away from the Nampa Property.  It then made its final payment through the Trust Account on March 3, 2006 for a total of $157,074.64 ($127,074.64 to Debtor and $30,000.00 to FTB).[11]  Aside from the initial $50,000.00 deposit approved through the Sale Order, none of DDR's expenditures through the Trust Account were made with notice to the Court or with the Court's approval.

---

[10] Fausett testified Hoffman "was riding me hard and the spur wounds are just healing now."

[11]  On March 3, 2006, two $15,000.00 checks were made out from the Trust Account to "For the Birds, Inc."  Ex. A(27).  Fausett testified that because the expenses covered by these funds had yet to be incurred, Debtor could not make the verifications required by the terms of the Funds Order and thus could not receive the payment.  Providing the funds to FTB instead of Debtor was Fausett's way of "working around" the problem.

MEMORANDUM OF DECISION - 13

DDR also claims it made at least $437,712.53 in direct payments for labor and materials used in constructing the habitat facilities on the Payette Property. Its final direct payment came on April 5, 2006, nearly five-and-a-half months after the October 24, 2005 deadline. The direct payments were made without notice to any interested party, except Debtor.

### G.    DDR's administrative expense claim

#### 1.    DDR alludes to future claim in pre-request filings

DDR hinted about filing a claim for animal removal costs. In its August 11, 2005 "response" to Debtor's motion for release of the $13,131.00 from the Trust Account, DDR stated it:

> *supports an expedited procedure that permits the Debtor to utilize estate funds* (and such funds as are generated by the Debtor post-petition) in order to accommodate the prompt removal of the animals. Such use of estate funds is consistent with the Debtor's statutory ability to use property of the estate under section 363(c)(1) of the Bankruptcy Code *and will reduce the risk of the estate incurring claims of DDR.*

Doc. No. 125 at 3, ¶ 4 (emphasis added). Less than three weeks later, in its "Response" to the UST's motion to convert or dismiss the case, DDR requested the Court "adjourn adjudication on the Motion pending expiration of the Animal Removal Period *and the adjudication of contingent claims of DDR[.]*" Doc. No. 155 at 4 (emphasis added).

However, DDR did no more than make these passing comments. Despite presence of counsel and active participation in the bankruptcy case, DDR did not

MEMORANDUM OF DECISION - 14

make a § 503(b) request, advise the Court and parties it had expended (and

anticipated expending) substantial amounts above the Court-sanctioned

$50,000.00, raise objections to Debtor's conduct, or otherwise seek to protect its

interests.

Debtor filed a proposed chapter 11 plan on October 18, 2005.  Doc. No.

182.  It made no mention of treating any of DDR's expenditures as administrative

expenses.  *Id.* at 2-3.  DDR did not formally protest.

At a November 7, 2005 hearing, DDR's counsel stated the animals had not

been removed from the Nampa Property.  He also stated Debtor was working hard

to effect the removal and that DDR had been advancing funds for labor and

materials.  Counsel claimed the expenditures were "beneficial to the estate," but

did not move the Court to grant an administrative expense for any of the

expenditures DDR was making, allegedly on Debtor's behalf.  Nor did DDR move

the Court to enforce the terms of the Sale Agreement, even though Debtor was

clearly in default for missing the October 24, 2005 deadline.

### 2.    DDR's communications with Debtor about reimbursement

By early September, Fausett was on the scene working with Debtor on the

relocation.  He testified he "consulted" Debtor about costs on a weekly and

MEMORANDUM OF DECISION - 15

sometimes daily basis throughout the process.[12]  In January 2006, Fausett says he

advised Debtor the overall cost of the project was approaching $300,000.00.

Debtor allegedly responded by joking that, if the costs reached a much higher

figure, he might have to fight DDR on repayment, implying (at least in Fausett's

mind) Debtor had no objection to the amount quoted.  Based on this conversation,

and his course of dealing with Debtor, Fausett testified he thought Debtor realized

DDR was merely "helping out" by advancing funding.  Fausett said it was his

"impression" there would ultimately be a "reconciliation" of the costs, meaning

Debtor would reimburse DDR.  Any "understanding" regarding Debtor's

obligation to repay DDR was no more certain than this.[13]

### 3.    Additional filings

Debtor filed an amended disclosure statement on January 16, 2006,

indicating the Court's Sale Order would limit any DDR expense:

> DDR, the buyer of the debtors former property located at 1510 Happy
> Valley Rd., Nampa, Idaho may file an administrative claim associated
> with the removal of the animals associated with said property *and as
> discussed in the court's order approving the sale of said real property*.

---

[12] Fausett claimed he would ask Debtor how the relocation process was going and
whether he needed materials or labor.  Once Debtor explained what he needed, Fausett would
arrange for the expenditures.  Hoffman testified Debtor was actively involved in the process of
moving the animals and constructing their pens.  Debtor claims he was rarely consulted about
materials, and offered some input as to construction of the pens.  He also claims his employees
came under the control of DDR's construction supervisors.

[13]  The Court is required under the present § 503(b) request to address the liability of
Debtor's estate.  As noted earlier, FTB claimed to own the animals.  FTB was not, after May,
2005, in bankruptcy.  The Court does not opine on issues between DDR and FTB.

MEMORANDUM OF DECISION - 16

> While it is unknown at this time whether or not such a claim will be
> filed in this matter, should such claim arise in the course of this
> proceeding, after review and approval of any such claim by the court,
> such administrative claim shall be paid through the chapter 11 Plan.

Doc. No. 216 at 7 (emphasis added). DDR did not refute this limitation on any
administrative claim, nor respond with a § 503(b) request. It did, however, object
to Debtor's proposed plan over a month later, contending the plan failed to
"provide for a procedure with regards to the allowance and payment of DDR's
administrative expense claim (Class I Claim)," failed to provide for retention of
jurisdiction for enforcement of the Sale Order and Sale Agreement,[14] and was not
feasible because animal removal was incomplete and the Nampa Property had not
been vacated. Doc. No. 235 at 1-2.

In its plan objection, DDR alluded to a possible administrative expense
request for "consequential damages resulting from the continued presence of the
animals" on the Nampa Property and its "incurrence . . . of nearly $500,000 in
itemized reimbursable expenses associated with the Animal Removal." *Id.* at 2.
DDR stated that because the animals had not been removed by the deadlines set
forth in the Sale Agreement, DDR's expenditures were "necessary to effect the
terms of the Sale Order, mitigate consequential damages to the estate, and to
preserve the value and the safe keeping of the animals." *Id.* at 3, ¶ 2. Further,

---

[14] Retention of jurisdiction was already provided for in the Sale Order and Sale
Agreement. *See* Doc. No. 110 at 12, ¶ 14; Doc. No. 110 at Ex. B, § 8.

MEMORANDUM OF DECISION - 17

"[a]bsent the incurrence of consequential damages resulting from delays in construction and marketing, DDR expects to limit its administrative claim to these Direct Expenditures." *Id.* at ¶ 4 (referring to an amount identified only as "in excess of $400,000.00 . . . of Direct Expenditures" and which did not include the initial $50,000.00, any unliquidated or contingent expenditures, other damage claims or internal expenses of DDR.)

### 4.    DDR's request for an administrative expense

DDR finally filed a § 503(b)(1)(A) request on April 14, 2006 ("Request"). Doc. No. 249. Echoing the language used in its objection to Debtor's plan, DDR sought administrative expense treatment for "expenses necessary to effect the terms of the Sales Order, mitigate consequential damages to the estate, and preserve the value and the safe keeping of the animals." *Id.* at 5, ¶ 10. DDR's Request asks for allowance of an amount "no less than $594,787.17." *Id.* at 10, ¶ 23. This figure consists of $157,074.64 disbursed through the Trust Account and (mathematically) $437,712.53 in direct expenditures.[15] Debtor, the UST and the Custodian all object. Doc. Nos. 251, 252, 261.[16]

---

[15]  The $594,787.17 amount does not jibe with the amounts contained in the body of DDR's Request. When the $157,074.64 DDR claims was expended through the Trust Account, Doc. No. 249 at 8, ¶ 15, is added to the amounts DDR claims to have directly spent on animal pens and moving expenses, *id.* at 8-9, ¶¶ 16-21, the total exceeds $750,000.00. It climbs to more than $800,000.00 if "Other Expenses," *id.* 10, ¶ 23, are added.

[16]  Susan moves for release of one half (her community interest) of the remaining sale proceeds ($1,183,861.00 at the time of the motion). Doc. No. 258 at 1. At hearing, she argued
(continued...)

MEMORANDUM OF DECISION - 18

The Court set the matter for a bifurcated hearing. The initial issue is whether DDR is entitled to an administrative expense priority for animal relocation costs. If the answer is in the affirmative, evidence will be taken at a continued hearing as to the amount of such expense.

**DISCUSSION AND DISPOSITION**

**A.    Section 503(b)(1)(A) standards**

Section 503 provides in pertinent part:

(a) An entity may timely file a request for payment of an administrative expense . . . .

(b) After notice and a hearing, there shall be allowed, administrative expenses . . . including –

(1)(A) the actual, necessary costs and expenses of preserving the estate . . . rendered after the commencement of the case[.]

The burden of proving entitlement to benefit of an administrative expense is on the claimant. *Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)*, 319 F.3d 1166, 1172 (9th Cir. 2003)*; Texas Comptroller v. Megafoods Stores, Inc. (In re Megafoods Stores, Inc.)*, 163 F.3d 1063, 1071 (9th Cir. 1998).

While the Court has broad discretion to grant administrative expense requests, it is required to construe § 503(b) – and its terms "actual" and

_____

(...continued)
any administrative expense granted DDR should be paid solely by Debtor. Susan's motion will be dealt with in a separate decision.

MEMORANDUM OF DECISION - 19

"necessary" – narrowly to keep costs to a minimum and preserve the limited assets of the bankruptcy estate for the benefit of unsecured creditors. *BCE West*, 319 F.3d at 1173 (citing *AMTRAK v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988)); *In re TSB, Inc.*, 302 B.R. 84, 87, 03.4 I.B.C.R. 220, 221 (Bankr. D. Idaho 2003).

To establish entitlement to an administrative expense, the claimant must show the debt it incurred (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity, and (2) directly and substantially benefitted the estate. *BCE West,* 319 F.3d at 1172 (citing *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998)); *In re Cent. Idaho Forest Prods.*, 317 B.R. 150, 156, 04.4 I.B.C.R. 159, 161 (Bankr. D. Idaho 2004).

### 1.    Transaction with debtor-in-possession

Debtor filed his petition on November 30, 2004.  Negotiation and sale of the Nampa Property was finalized between Debtor and DDR in June 2005 and closed on July 15, 2005.  DDR had no involvement with Debtor prior to the filing of the chapter 11 petition.  Whatever the genesis of the claim(s) at issue, they arose, temporally, post-petition from transactions with the debtor-in-possession. DDR satisfies the first part of the § 503(b)(1)(A) test.

MEMORANDUM OF DECISION - 20

## 2.    Direct and substantial benefit

The Court must next decide whether the debt asserted for administrative

expense treatment "directly and substantially benefitted the estate."[17]

The sale of the Nampa Property to DDR was no doubt a direct and

substantial benefit to the estate.  The Sale Order found the DDR transaction to be

"in the best interests of the Debtor, the estate and parties in interest[.]"  Doc. No.

110 at 4, ¶ O.  Likewise, it found the "Custodian has articulated a sound business

justification and business judgment for the sale."  *Id*. at ¶ P.

DDR's provision of the $50,000.00 as an adjunct to the $1,700,000.00

purchase price was likewise a direct and substantial benefit.  All the parties agreed

at the time of the Sale Order that animal removal was key to selling the real estate,

and that the $50,000.00 payment would facilitate consummation of the sale.

However, just because the sale itself, and the provision of $50,000.00 were

beneficial does not resolve the question under § 503(b)(1)(A).  The focus is on the

---

[17] The objectors argue the benefit to the estate was incidental and that DDR expended the funds in its own self-interest.  The Ninth Circuit recently noted the apparent "conflict among the circuits as to whether a creditor's self-interest is important to the § 503(b) analysis."  *See Cellular 101, Inc. v. Channel Commc'ns, Inc. (In re Cellular 101, Inc.)*, 377 F.3d 1092, 1097-98 (9th Cir. 2004) (noting the Fifth and Eleventh Circuits do not consider a creditor's self-interest to be important, while the Third and Tenth Circuits do).  Judge Brunetti was adamant that a creditor's self-interest in rendering a benefit to the estate should not be considered.  *Id.* at 1098-99 (Brunetti, J., concurring) (applying plain meaning analysis to § 503(b) and concluding "that a creditor's motivation is not dispositive or even relevant in deciding whether to grant a § 503(b) claim.").  *See also*, 4 Collier on Bankruptcy ¶ 503.06[3][b] at 503-27 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2006) (examination of a claimant's subjective motives is "unwarranted" in the context of § 503(b)(1)(A)).  The Court is able to decide the present case without attempting to resolve this argument.

MEMORANDUM OF DECISION - 21

debts DDR now asserts, and whether *they* reflect a direct and substantial benefit to

Debtor's estate.

DDR argues its claims were for "expenses necessary to effect the terms of

the Sale Order, mitigate consequential damages to the estate, and preserve the

value and safe keeping of the animals." DDR contends that by providing these

funds it "preserved the remaining proceeds of the sale of the Nampa Real Estate

by mitigating the damages to the estate resulting from the Debtor's delay and

failure to deliver exclusive possession of the property" as required under the Sale

Agreement. Doc. No. 249 at 7, ¶ 13.

### a.    Breach of contract

DDR's principal argument centers around the damages it allegedly

sustained – or would have sustained but avoided or mitigated – as a result of

Debtor's breach of the Sale Agreement.

DDR argues it is "well established as a matter of law that damages arising

out of a debtor's breach of . . . a new postpetition contract" are entitled to an

administrative expense. Doc. No. 288 at 7-8. The objectors do not agree.

In *Reading Co. v. Brown*, 391 U.S. 471 (1968), the U.S. Supreme Court

held the "actual" and "necessary" costs as now referred to in § 503(b)(1) "should

include costs ordinarily incident to operation of a business, and not be limited to

MEMORANDUM OF DECISION - 22

costs without which rehabilitation would be impossible." *Id.* at 483.[18]  Although

*Reading Co. v. Brown* involved tort injuries caused by the negligence of a receiver

appointed to operate the debtor's business, a leading bankruptcy treatise states:

> If the trustee[19] enters into a contract or lease after entry of the order for
> relief and subsequently breaches the contract or lease, the other party
> will have a claim for damages.  The amount of those damages will be
> determined under the contract or lease.  As long as the other party can
> demonstrate that the contract obligations are entitled to administrative
> treatment status, the full amount of such obligations will constitute
> administrative expenses.

4 Collier ¶ 503.06[6] at 503-36.

The objectors argue that damages from breach of contract fall outside the

ambit of *Reading*.  They point to case law that can be read as suggesting *Reading*

is limited to damages arising from the trustee or debtor in possession's "tort-like"

activity,[20] or failure to follow state law.[21]  Since it appears the Ninth Circuit may

---

[18]  *Reading* was decided under the Bankruptcy Act, but survived enactment of the Code. *Megafoods*, 163 F.3d at 1071; *Gonzalez v. Gottlieb (In re Metro Fulfillment, Inc.)*, 294 B.R. 306, 310 (9th Cir. BAP 2003).

[19]  The term "trustee" includes a chapter 11 debtor in possession.  *See* § 1107(a).

[20]  *See In re ZiLog, Inc.*, 450 F.3d 996, 999 n. 1 (9th Cir. 2005); *Oregon Dep't of Human Res. v. Witcosky (In re Allen Care Ctrs., Inc.)*, 96 F.3d 1328, 1331 (9th Cir. 1996); *NLRB v. Walsh (In re Palau Corp.)*, 18 F.3d 746, 751 (9th Cir. 1994).

[21]  *See Metro Fulfillment*, 294 B.R. at 311-12; *In re Sierra Pac. Broadcasters*, 185 B.R. 575, 579 (9th Cir. BAP 1995).

MEMORANDUM OF DECISION - 23

not have squarely addressed this issue,[22] this Court concludes it should address the breach of contract claim.

At first blush, it appears any breach of contract claim DDR may have would be limited to $50,000.00.  The Sale Agreement and Sale Order required DDR to deposit that amount into the Trust Account, such sums to be used relocating the animals.  Section 21 of the Sale Agreement clearly requires Debtor to immediately *return* the $50,000.00 deposit should he fail to meet the animal removal deadlines.  Debtor's breach of the October 24, 2005 deadline triggers that potential damage.

Nothing in the Sale Agreement, Sale Order or Funds Order required DDR to provide any money beyond that.  Nevertheless, DDR funneled an additional $107,074.64 through the Trust Account, and allegedly made another $437,712.53 in direct payments for labor and materials to build the zoo on the Payette Property owned by Lois Korn.  Because neither the Sale Agreement nor its implementing Sale Order obligated DDR to advance any money to Debtor, for any purpose, beyond the initial $50,000.00, there can be no breach of contract claim *under the Sale Agreement* regarding a failure to repay those additional amounts.[23]

---

[22] *See BCE West*, 319 F.3d at 1172 (deciding case on other grounds, but noting "[w]hether an alleged *breach of contract* for failure to seek a non-disturbance agreement – which ultimately resulted in alleged post-petition damages – is entitled to administrative expense priority has not been decided in this Circuit.") (emphasis added).

[23] Similarly, DDR has not established that its provision of funds beyond the $50,000.00

(continued...)

MEMORANDUM OF DECISION - 24

This leaves the question of the return of the $50,000.00.  As to this initial deposit, the Court concludes DDR waived any monetary remedies it had under the Sale Agreement.

### i.    Waiver

Waiver is a voluntary, intentional relinquishment of a known right or advantage.  *Seaport Citizens Bank v. Dippel*, 735 P.2d 1047, 1050 (Idaho Ct. App. 1987).  Waiver is a question of intent involving a mixed question of law and fact. *Primary Health Network, Inc. v. Dep't of Admin.*, 52 P.3d 307, 313 (Idaho 2002) (citing *Seaport Citizens Bank*, 735 P.2d at 1050).  A court must find, first, whether the facts alleged to constitute a waiver are true, and second, if those facts suffice as a matter of law to show waiver.  *Jones v. Maestas*, 696 P.2d 920, 922 (Idaho Ct. App. 1985).  The doctrine of implied waiver by silence is disfavored.  *Id*. Furthermore, waiver will not be inferred except from a clear and unequivocal act manifesting an intent to waive, or from conduct amounting to estoppel.  *Id*.  Where a waiver arises out of conduct and partakes of the nature of an estoppel, no consideration is necessary.  *Idaho Bank of Commerce v. Chastain*, 383 P.2d 849, 853-54 (Idaho 1963).

Although DDR's counsel stated during a November 7, 2005 hearing that Debtor still had not removed the animals from the Nampa Property, DDR did not

---

[23](...continued)
was "necessary to effect the terms of the Sale Order" as alleged in its submissions.

MEMORANDUM OF DECISION - 25

declare a breach of the Sale Agreement, nor did it seek any remedies available thereunder.  Furthermore, DDR continued to make substantial deposits into the Trust Account, as well as direct expenditures for labor and materials, well after the September 24 and October 24, 2005 deadlines.

Based on these facts, the question becomes whether, as a matter of law, DDR waived its right to return of the $50,000.00 as provided for under § 21 of the Sale Agreement.[24]  DDR's intent on this matter seems clear.  Were it concerned with return of the Animal Removal Deposit, it would not have voluntarily made cash infusions into the Trust Account after October 24, 2005 for Debtor's use. Nor would it have continued to make direct payments to vendors for labor and materials after that date.

Hoffman testified DDR did not seriously consider declaring a default because they had to keep pushing forward on the project.  He also testified that to the best of his knowledge, DDR was not even seeking reimbursement of the initial $50,000.00 deposit as part of its administrative expense claim.

Fausett testified he was so concerned about clearing the Nampa Property he did not even consider the terms of the Sale Agreement when he authorized expenditures.  Fausett claimed he indicated to Debtor, in January of 2006, that

---

[24]  DDR never sought termination of the Sale Agreement and return of its earnest money, or specific performance.  Both options were available under § 8 of the Sale Agreement.  It is instead seeking damages for breach of § 21.  The only damages remedy expressly provided for under that section is return of the $50,000.00 deposit.

MEMORANDUM OF DECISION - 26

DDR expected to be repaid for the expenses it was advancing for labor and materials. Whether this included the initial $50,000.00 under the Sale Agreement was not clear, but then again, neither was the meaning or content of the alleged conversation as a whole. Furthermore, Fausett admitted the sums advanced on Debtor's behalf after October 24, 2005 were made voluntarily.

In sum, DDR's actions evince a clear intent to waive the remedy available under the Sale Agreement for return of the initial $50,000.00 deposit made to the Trust Account.

### b.    Modification of the contract

The Court also concludes the Sale Agreement cannot be deemed modified or amended by the parties' conduct in order to support a breach of contract claim. The Sale Agreement expressly provides:  "[t]his Agreement constitutes the sole and entire agreement among the parties hereto and *no modification of this Agreement shall be binding unless in writing and signed by all parties hereto*." Doc. No. 110, Ex. B. at § 11 (emphasis added).[25]  There is no proof of any written

---

[25]  These clauses are commonly referred to as "integration" or "merger" clauses. A written contract that contains a merger clause is complete upon its face. *Howard v. Perry*, 106 P.3d 465, 468 (Idaho 2005) (citing *Chambers v. Thomas*, 844 P.2d 698, 701 (Idaho 1992); *Valley Bank v. Christensen*, 808 P.2d 415, 417 (Idaho 1991)). The *Howard* Court recently observed:

> The purpose of a merger clause is to establish that the parties have agreed that the contract contains the parties' entire agreement. The merger clause is not merely a factor to consider in deciding whether the agreement is integrated; it proves the agreement is integrated. To hold otherwise would require the parties to list in the contract everything upon which they had not agreed and hope that such list covers

(continued...)

MEMORANDUM OF DECISION - 27

agreement modifying the rights and obligations of the parties under the Sale

Agreement.  Accordingly, there can be no argument the additional advances were

part of the Sale Agreement or a modification of that agreement.

### c.    Mitigation of damages

DDR claims it should be granted an administrative expense for funds it

expended to "mitigate consequential damages" under the Sale Agreement.  In its

post-trial brief, DDR states:

> As a consequence of the Debtor's failure to remove the animals from
> the Nampa Real Estate prior to the expiration of the Animal Removal
> Deadline, DDR incurred damages associated with, among other things,
> the delay, extra expenses and a partial reconfiguration of the project
> and reasonable expenses associated with mitigation of such damages.
> In addition thereto, DDR incurred the expenses asserted in its Request
> with respect to assisting the Debtor in moving the animals and in
> preparing the cages and other facilities necessary to house the animals.

Doc. No. 288 at 6-7.

DDR appears to conflate "consequential damages" (*e.g.*, extra expense

from delay, cost of reconfiguration of project) with expenses "associated with

mitigation of such damages."  Further, DDR apparently advances a legal concept

requiring injured parties to make reasonable efforts to mitigate their damages, as a

theory to support an award of damages in the first instance.

---

(...continued)
every possible prior or contemporaneous agreement that could later be alleged.

*Howard*, 106 P.3d at 468.

MEMORANDUM OF DECISION - 28

The "duty" to mitigate, also known as the doctrine of avoidable consequences, provides that a plaintiff who is injured by a defendant's actionable conduct, will generally be denied recovery for damages which could have been avoided by reasonable acts, including reasonable expenditures, after the actionable conduct has taken place. *Davis v. First Interstate Bank of Idaho, N.A.*, 765 P.2d 680, 681 (Idaho 1988); *Casey v. Nampa & Meridian Irrigation Dist.*, 379 P.2d 409, 412 (Idaho 1963). The reasonableness of the method selected to minimize damages is an issue for the trier of fact. *See Casey*, 379 P.2d at 412. The burden of proof is on the party causing the alleged damage to show damages could have reasonably been minimized further. *Clark v. Int'l Harvester Co.*, 581 P.2d 784, 805 (Idaho 1976).

Accordingly, "mitigation" is not generally an affirmative theory of recovery. It is a vehicle employed by defendants to show a plaintiff did not take reasonable steps to minimize its damages. If the defendant is successful, the court can reduce or even deny the damages asserted by the plaintiff. In this regard, DDR's *affirmative* claim for mitigating damages is misplaced.

Consequential damages are those that "result indirectly" from an injurious act. Black's Law Dictionary 416 (8th ed. 2004). They are not recoverable unless specifically within the contemplation of the parties at the time of contracting. *Silver Creek Computers v. Petra, Inc.*, 42 P.3d 672, 677 (Idaho 2002).

MEMORANDUM OF DECISION - 29

For example, had DDR's anchor tenant pulled out of the project as a consequence of Debtor's breach of the Sale Agreement, Debtor arguably could be liable for damages caused DDR by the loss of the tenant. However, those damages could be reduced if DDR did not take reasonable steps to replace the tenant, and thus minimize, or mitigate, its damages.

It appears DDR is claiming damages of nearly $600,000.00 resulting from Debtor's breach. Those amounts do not relate to Gateway Project costs incurred due to Debtor's delay in vacating the Nampa Property (engineering or other reconfiguration, increases in cost of financing, etc.). These amounts are not themselves "consequential damages."

The next issue is whether DDR's expenditures on the animal relocation were "reasonably" incurred in an effort to mitigate its possible damages.

To be reasonable as mitigation, there must be some larger damage that was avoided by spending nearly $600,000.00 to remove the animals. DDR has not identified that damage. To the extent DDR suggests Debtor's breach of the Sale Agreement's October 24, 2005, deadline threatened the entire $90 million Gateway Project, the Court does not find this credible.[26]

---

[26] Hoffman testified that if he failed to secure an agreement to move Debtor's animals off the Nampa Property, he would have recommended DDR forgo the entire project. However, he did secure the agreement he was looking for, and it was memorialized in the Sale Agreement and Sale Order.

MEMORANDUM OF DECISION - 30

First, the testimony at hearing indicated the delay in vacating the Nampa Property impacted primarily DDR's schedule regarding site delivery to the anchor tenant. While worrisome, DDR successfully resolved the March 1, 2006 site delivery deadline by relocating the tenant to the other side of the development.

Further, despite the Agreement's requirement that Debtor and his animals be off the Nampa Property by October 24, 2005, there is no evidence to indicate the Gateway Project was in jeopardy of failing, or that tenants were pulling out as a result of Debtor's breach of that requirement. Moreover, for all the testimony about time being a paramount concern, DDR seems to have adapted to the delay in vacating the Nampa Property, even though Debtor was nearly six months late in removing his animals. As Custodian points out, the "March 1, 2006 date passed without incident." Doc. No. 287 at 15.

Finally, the process and manner in which DDR spent the $600,000.00 was patently unreasonable.[27] As the objectors observe, DDR approved expenditures haphazardly and without reference to a budget or construction plan. DDR made additional deposits into the Trust Account without notice to the Court, and without modifying the Sale Agreement. It made even larger direct expenditures without

---

[27] As part of its "reasonable" efforts to limit its damages, DDR argues it relied on Debtor's alleged assertions that he would reimburse the several hundred thousand dollars in relocation costs. The Court does not find that alleged reliance credible or reasonable. DDR is a sophisticated, multi-million dollar real estate company. It had experienced commercial and bankruptcy counsel. It was not reasonable to rely on the verbal assurances of a chapter 11 debtor in possession, or to ignore the requirements of bankruptcy law.

MEMORANDUM OF DECISION - 31

notice to anyone but Debtor.  DDR's overarching concern was clearing the Nampa

Property as quickly as possible without any apparent regard to cost.[28]

The objectors also note DDR failed to pursue any of the remedies available

under the Sale Agreement, such as demanding specific performance.[29]  DDR

potentially could have sought this remedy as early as September 24, 2005.  Under

§ 21 of the Sale Agreement, Debtor was entitled to a 30-day extension only if he

"*diligently* pursue[d] completion of the Animal Removal."

The Court does not find it was reasonable for DDR to spend $600,000.00

relocating Debtor's animals, particularly in the manner it did.  DDR will not be

granted an administrative expense for "mitigating consequential damages."

### d.      Safekeeping the animals

In addition to theories of relief based on breach of the Sale Agreement and

the Sale Order, DDR makes arguments related to the benefit provided the estate

from "preserving the value [of] and safe keeping" the animals.  It allegedly

bestowed this benefit by building new habitats in Payette County.  The Court

---

[28]  Fausett testified DDR finally decided to cap its expenditures once they topped $500,000.00, deciding this was the most it wanted to spend on the relocation process.

[29] Specific performance is an equitable remedy available when legal remedies (monetary damages) are inappropriate or inadequate. *See Fullerton v. Griswold*, 136 P.3d 291, 294 (Idaho 2006) (citing *Kessler v. Tortoise Dev., Inc.*, 1 P.3d 292, 298 (Idaho 2000)).  Inadequacy of remedies at law is presumed in an action for breach of a real estate purchase and sale agreement due to the perceived uniqueness of land.  *Id.*  The decision to grant specific performance is within the court's discretion.  *Kessler*, 1 P.3d at 298.  In this case, specific performance was expressly provided for under § 8 of the Sale Agreement but never sought.

MEMORANDUM OF DECISION - 32

concludes DDR has failed to sustain its burden of showing it provided a substantial benefit to this estate.

First, Debtor does not own the real property on which the pens and cages were constructed. Any benefit the "zoo" brings to that real property inures, apparently, to Debtor's mother.

Second, the weight of the evidence indicates the animals are owned by FTB. Though Debtor owns and operates that entity, and though Debtor has shown a distressing lack of attention to keeping corporate and personal finances and businesses separate, DDR did not establish the "safe keeping" of the animals benefitted Debtor's estate as opposed to FTB. Certainly, the last $30,000.00 from the Trust Account paid directly to FTB did not benefit Jerry Korn's estate. Even if the *estate* avoided some expense or received some other benefit from DDR's advancing funds beyond the $50,000.00 DDR was contractually obligated to provide, that benefit to this estate was incidental, not "direct and substantial."

### B.    Section 364

Though not entirely clear, DDR seems to contend its expenditures were "ordinary course of business" advances of unsecured credit to Debtor, entitled to administrative expense priority under § 364(a) without need of court approval on notice and hearing.[30] The Court disagrees.

---

[30] DDR's Request, Doc. No. 249, does not cite § 364, nor does its briefing, Doc. No. 263,
(continued...)

MEMORANDUM OF DECISION - 33

Section 364 governs the obtaining of credit or incurring of debt by a trustee (or, under § 1107(a), a debtor in possession) and sets forth the incentives that may be offered to induce potential lenders to extend post-petition credit. *Jewell v. Beeler (In re Stanton)*, 248 B.R. 823, 828 (9th Cir. BAP 2000) (citing *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092 (9th Cir. 1991)). Specifically, subsections (a) and (b) state:

> (a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

> (b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

Section 364(b) requires notice, hearing and court approval before a debtor in possession may obtain unsecured credit outside the ordinary course of business that, in turn, will be given an administrative expense priority. *Stanton*, 248 B.R. at 828-29; *United States v. Ledlin (In re Mark Anthony Constr., Inc.)*, 78 B.R. 260, 263 (9th Cir. BAP 1987).

---

(...continued)
288, does not mention it. However, the issue of ordinary course of business was mentioned by several parties during argument.

MEMORANDUM OF DECISION - 34

The sale of the Nampa Property and relocation of the animals was clearly
outside the ordinary course of business.  *See* Doc. No. 110.[31]  Advancing money
for Debtor to build a new habitat on non-estate real property for the animals was
also outside the ordinary course of business, and therefore required notice, hearing
and court approval before an administrative expense priority would be allowed.

DDR did not pursue such authorization, despite having engaged counsel,
lead and local, to assist it.[32]  It had sufficient time at virtually any point after the
Sale Agreement was approved to bring the matter to the Court's attention.

Instead, DDR began making unilateral and unauthorized distributions even
before the animal removal deadlines had arrived.  By doing so, it prevented the
Court from evaluating whether a financing arrangement was in the best interest of
Debtor, creditors and the estate.  It also prevented interested parties from objecting
or otherwise being heard in regard to such an arrangement.  Accordingly, DDR
will not be granted an administrative expense priority pursuant to § 364.

---

[31]  The Sale Order, signed by Debtor's counsel, DDR's counsel, the Custodian and the
UST, is encaptioned: "ORDER APPROVING AND CONFIRMING THE SALE OF THE
NAMPA REAL ESTATE FROM THE DEBTOR TO DDR OUTSIDE OF THE ORDINARY
COURSE OF BUSINESS." Doc. No 110 at 1.  In addition, this Court has previously held that
"infusion[s] of large sums of unsecured operating capital or the payment of trade debt by a third
party is not in the ordinary course of any business."  *Bear Lake West, Inc.*, 82 I.B.C.R. 186, 187
(Bankr. D. Idaho 1982).

[32]  Not only did the Sale Order serve to alert DDR to the § 364 and "ordinary course"
issues.  The Custodian had a § 364(b)/§ 503 motion, Doc. No. 75, pending to address moving the
animals, and the "omnibus order" entered five days after the Sale Order disposed of that motion.

MEMORANDUM OF DECISION - 35

C.    **Section 105**

As an alternative to § 503(b)(1), DDR seeks relief under § 105.  Section

105(a) states:

> The court may issue any order, process, or judgment that is necessary
> or appropriate to carry out the provisions of this title.  No provision of
> this title providing for the raising of an issue by a party in interest shall
> be construed to preclude the court from, sua sponte, taking any action
> or making any determination necessary or appropriate to enforce or
> implement court orders or rules, or to prevent an abuse of process.

However broad the statute may appear, it does not give the Court "roving

commission to do equity as it might perceive it."  *In re Couch-Russell*, 03.4

I.B.C.R. 230, 232 (Bankr. D. Idaho 2003) (citing *Graves v. Myrvang (In re

Myrvang)*, 232 F.3d 1116, 1124 (9th Cir. 2000)).  The Court's § 105 powers are

limited to those "necessary or appropriate to carry out the provisions of this title."

DDR has not set forth any compelling argument why the Court should

exercise its § 105(a) powers to grant it an administrative expense priority.  Even

had DDR done so, § 105(a) only allows the Court "to enforce or implement court

orders," not negate them.  Accordingly, DDR's motion for relief pursuant to

§ 105(a) is found not well taken.

**CONCLUSION**

For the foregoing reasons, the objections to DDR's Request for allowance

of an administrative expense, Doc. Nos. 251, 252, 261, will be sustained and

DDR's Request, Doc. No. 249, denied.  The second phase of the bifurcated

MEMORANDUM OF DECISION - 36

hearing is rendered moot.  An order consistent with this Decision will be entered

by the Court.

DATED:  October 6, 2006

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 37

## CERTIFICATE RE: SERVICE

A "notice of entry" of this Decision and Order has been served on Registered Participants as reflected by the Notice of Electronic Filing.  A Copy of the Decision and Order has also been provided to non-registered participants by first class mail addressed to:

Jerry Korn
6999 Little Willow Road
Payette, ID 83661

Case No. 04-4261-TLM

Dated: October 6, 2006

/s/

_____

Jeremy J. Gugino
Law Clerk, Chief Bankruptcy Judge Terry L. Myers

MEMORANDUM OF DECISION - 38